Okay, when you're ready. Good morning. May it please the court, my name is Rebecca Smith and I represent the appellant in this case, Alliance for the Wild Rockies. I would like to reserve two minutes for rebuttal. This case is on appeal from the denial of a preliminary injunction. And what it really asks at a fundamental level is what is the purpose of even having a NEPA analysis? And the reason it asks this question is because in this case the two key facts are that the agency offered what it calls a cursory preliminary letter that, quote, was not intended to serve as environmental analysis to meet the requirements of NEPA. And then it offered a public comment on that cursory letter that was not intended to be an environmental analysis under NEPA. And then six months later it produced its environmental analysis, but it did not allow any public comment on the actual environmental analysis produced to comply with NEPA. And when we look at what the purpose of NEPA really is, it is to give the public an accurate, high-quality, scientific analysis that fully informs the public and to allow public scrutiny of that analysis before a decision is made. I know you do this in the brief, but could you very briefly here tell us what was missing in the scoping letter that then shows up later in the EA that's material to your argument? Yes, Your Honor. And I understand we've got two, but the sins, to the extent where there are sins, they're roughly equivalent, I gather. I'll first start out with the tower scoping letter, tower environmental analysis. So this is a case, both of these cases involve a significant amount of logging, 6,000 acres total, and a significant amount of road building and reconstruction over 200 miles of new roads or roads reconstructed or maintained. And so this is also in an area where a wildfire had burned through. And I am going to get to your question, Your Honor, but just before that, the reason that this is controversial is because logging right after a disturbance has significant environmental effects. And so one of the effects is the soil disturbance. The soil is very sensitive at this time of year. So one of the issues here was, did the Forest Service discuss soil disturbance in these preliminary letters? And so they talk about that in terms of detrimental soil disturbance. So in the tower environmental assessment, the Forest Service ultimately disclosed, and this is at ER 345, that this logging would actually violate regional soil quality standards in units 10, 14, 22, 33, 38, 42, 43, 44, 55, 76. That was not disclosed in this preliminary letter. They also disclosed in the tower environmental assessment that the project would cause 517 acres of detrimental soil disturbance. That's at ER 347. And again, that amount of detrimental soil disturbance was not disclosed in that preliminary letter. And there's a similar failure in the Grizzly environmental assessment regarding soil disturbance. There we have at ER 319, the Grizzly environmental assessment states there will be 327 acres of detrimental soil disturbance. That was not disclosed to the public in these cursory preliminary letters. Other flaws that were significant to the public was, I'll just touch on two of the main ones. One is that this is supposed to be logging that is limited to dead and dying trees. But that preliminary letter never told the public what that phrase even means. And so it wasn't until the environmental assessments, which were issued after the decision had already been made, that they finally tell the public, by the way, dead and dying trees mean trees that we think might die within five years. And so that really changes everything, because all of a sudden they're not just talking about dead trees. They're talking about a logging contractor going into the woods and making a guess about whether a tree might die in five years. And if they make a guess, there's no oversight of that guess. That tree just comes down. That was not disclosed in those preliminary cursory letters in either the Grizzly or Tower Project. Right, and I gather the prediction of death is allowed to calculate not merely how much crown is left, but root damage from the heat of the fire, which, if that's going to be the cause of eventual death, you've got to have a sense as to how hot the fire was when it went through there, and that's going to be pretty speculative. So it may be a tree that looks as though it actually has very little visible damage, but nonetheless, under the criteria of the EA, one of the things that can be counted is, well, the fire was hot, and therefore the roots are bad. Yes, Your Honor, and it is highly speculative, and that's why we wanted that analysis given to the public before the decision was made. And so, again, what we're saying here was that there was an environmental analysis that was ultimately completed, but it wasn't done until after the decision had already been made. And NEPA, at its most fundamental level, requires that analysis to occur before. That's 4 DCFR 1500.1B. It has to occur before the analysis, not after. It also says, I'm just quoting here from 4 DCFR 1500.1B, NEPA must ensure that environmental information is available to citizens before decisions are made. The information must be high quality, accurate scientific analysis, expert agency comments, and public scrutiny are essential. And so even the Forest Service itself is admitting that these preliminary scoping letters were not intended to be the environmental analysis. That's why they later completed an environmental analysis. But the problem is that fundamentally undermines the entire purpose of NEPA when you don't provide the analysis until after you've already made the decision. And that's compounded in this case, because we used to have this case law bearing straight, which sort of addressed, that was an opinion from this court, which addressed how much analysis and how much public participation needs to happen on environmental assessment. In bearing straight, this court said, basically in cases where there are no regulations that set a public comment period for an environmental assessment, here's the standard we're going to apply. The problem with applying bearing straight to this case is that in 2012 or 2013, the Forest Service finally did implement its own regulations that set forth a required public comment period for NEPA. And this is an important issue, because the district court did not address this new regulation. It did address bearing straight, but it didn't address the caveat in bearing straight that bearing straight only applies if there is no regulation that sets forth a public comment period for an EA. And here, since bearing straight, we now have 36 CFR 218.25, which specifically says opportunity to comment, and then goes on to say that the comment period for an environmental assessment is 30 days. And in response to public questioning when the Forest Service issued this regulation in the Federal Register, people said, well, could you please extend that in cases that have extraordinary circumstances? And they responded and said, no, it's a 30-day comment period on an EA, that's it. And so the problem with the district court's opinion in this case is that it just glosses over and does not even address that there is actually a regulatory requirement now, not at the time of the bearing straight opinion, but now there is a regulation that requires a 30-day comment period on an EA, and that undisputedly was not complied with in this case. I've got a different question, and that is, one of your arguments is, as we're trying to figure out whether or not the emergency procedure can be followed, well, we've got two criteria that the Forest Service argues are satisfied, one having to do with safety, and that is to say the trees alongside or near the road, and the other one is economic viability of the project. I want to talk about the road, when we finally get to the EA, they've got three alternatives. The one is no action, and under the no action, a certain number of acreage will be cut for road safety, but then when you get to the alternatives, one and two, for purposes of road safety, more acreage will be cut. Now, your contention is, well, but they're going to cut the trees alongside the road for safety in any event, even without either of the two alternatives. Can you help explain to me what you mean, given the difference in acreage between the no action alternative and either of the two action alternatives with respect to trees beside the road? Absolutely, Your Honor, and I'll start out with a grisly project here. The difference is that in the no action alternative, roads that are currently closed stay closed. In the action alternatives where there's logging, roads are reopened for logging, and those previously closed roads that are reopened for logging will then have the roadside trees cut down. And so the no action alternative is only addressing the roads that are already publicly open, whereas the action alternatives also address logging along what are now closed roads, but will be reopened for logging, essentially for the safety of the logging contractors. And would the roads that are reopened for purposes of logging stay open after the completion of the project? No, Your Honor, and that has to do more with grizzly bear restrictions, but yes. Well, okay, well, that really means that the criteria for cutting the trees for purposes of safety beside those roads that are open for that very short period, that's a very different criteria for cutting. Yes, Your Honor, and I would like to also emphasize that in the district court's opinion, there was a clearly erroneous finding of fact there where the district court gave the wrong number, and I just wanted to clarify that in the district court's opinion at ER 11, the district court stated that 2,373 acres of roadside tree removal would occur in the tower project, and that's not correct. Actually, at ER 256, it says there will only be 1,335 acres. I just wanted to quickly correct that factual inaccuracy. And also missing from the district court's opinion on that issue is that the majority of the logging, 57 percent, is not along roadside. So at the very most, you would have only a minority of the project that even goes under that hazard tree prong. And I guess I would like to move on then and address the other prong of the emergency situation determination, which is the commodity value. First and foremost, the biggest problem that Alliance has with this issue is that 36 CFR 218.21 specifically says that the loss of commodity value must jeopardize the agency's ability to maintain the property to accomplish project objectives directly related to resource protection or restoration. The Forest Service has never quantified the project objectives directly related to resource protection. So we don't know what objectives those are, how many acres they occur on, or how much they cost. And so in order to know whether the funding for those objectives is jeopardized, we first have to know how much it costs. That's a number that the agency concedes, it never determined, and without that determination, they cannot say that they are complying with the language of this regulation. And if I could reserve my remaining time for rebuttal. Thank you. May it please the Court, Alan Brabender with the Department of Justice here on behalf of the Forest Service. Before getting into the merits of these preliminary injunction appeals, I would first like to address the statuses of the projects. At the time of briefing, the Forest Service estimated that about 85 percent of the tower project volume and about 50 percent of the grizzly project volume had been removed from the project areas. Work started up again this summer and continued throughout the summer. And as of October 31st, the Forest Service estimates that about 99 percent of the tower volume and 80 percent of the grizzly volume has either been removed or has been cut and is awaiting removal. It is also my understanding that northern Idaho has received significant snowfall within this weekend, within this last weekend, and therefore project operations are probably done for the year. So that means this is not entirely moot? It is not constitutionally moot, Your Honor. But we would submit that the statuses of these projects further tip the balance of harms and the public interest, which already weigh heavily against enjoining the projects, even further against enjoining the projects. And I would like to address the status of the mitigation work. So an injunction could not put the dead or dying trees back on the stump, but it would prevent the Forest Service from reforesting the area with native trees, which are not likely to regenerate by themselves. The Forest Service or its contractors have planted a few hundred acres of native trees, but they have thousands of more acres left to plant. When you say native trees, help me out here. I've read the EA, and the EA is telling us that the trees that were burned are more susceptible to fire, more susceptible to disease, more susceptible to drought, and that the trees that are proposed to be put in are more drought tolerant, more resistant, and so on. So how did we end up with the trees that were burned? Were they planted, or were they naturally occurring trees? It is my understanding that the project area was not in its historic condition prior to the fire, mostly due to human interference in the area, the suppression of wildfire, or I think a lot of the native trees are highly valuable, and so those trees were part of previous timber harvests. You still haven't answered my question. Are the trees that were burned that are now going to be replaced if the project goes forward with different trees, were those trees planted, or were those trees naturally occurring?  But they were not represented in the proportion that they should be under historic conditions, Your Honor. And is that in the record, or are we just talking what you understand? No, I believe the EA does explain that, Your Honor. Moreover, these projects were planned from the start to avoid creating environmental impacts, and an injunction at this point would, much of the mitigation is left to be done, or at least some of the mitigation is left to be done. You know, I have to say this case bothers me a lot, because I read the scoping letters, and I read the EAs, and the EAs give an awful lot more information than the scoping letters. Scoping letters, they're maybe 20 pages long, single-spaced, I mean, they're longish, but they're very vague on lots and lots of stuff. What prevented the Forest Service from preparing either a better scoping letter that might have satisfied our requirements under the Bering Strait case, or from doing the EA? I understand the problem of salvage logging after fires, the trees deteriorate, I get that. But why couldn't the Forest Service have done a better job with the scoping letter, because I view the scoping letter as pretty miserable. I would disagree, Your Honor. I think the scoping letter is actually quite thorough if you compare it to other scoping letters. But if you compare it to the EA, it's not. Well, and let me explain, Your Honor. The scoping letter, by its very nature, comes at the very beginning of a NEPA process. Right. But you're asking us to treat the scoping letter as if it were the equivalent for purposes of notice and comment and sort of the NEPA process, as if it were the equivalent functionally of an EA. No, exactly. We are not making that argument, Your Honor. We would submit that the scoping letter is not the same as an EA, because by its very nature, the scoping letter comes at the very beginning of the process. Right. But what you've done is that's the only document to which the public is being allowed to make comments, because the EA comes in so late that the comments really are irrelevant. Well, no. The agency, the scoping letter is just one of the many mechanisms that the agency used to inform the public of the projects and to seek public comment. Because of the timing considerations here, the agency engaged with the Panhandle Forest Collaborative Group very early in the process. And we're told by the other side those are Forest Service industry friends. Those are not. No. So the briefing on the other side is not telling us the truth? That is correct. And if you look at Judge Windmill's opinion, Judge Windmill recognizes that the Panhandle Forest Collaborative Group consists of conservation groups, including the Lands Council, which is a frequent Forest Service opponent. It also includes the Idaho Conservation League. I noticed the names on that and the members of the group. I did see that. Yeah. Yeah. And so meeting with this group very early on changed the Forest Service proposal. Among other things, the agency— Did you meet with the adversaries in this case? They did not. They could have asked for a meeting. They did not ask for a meeting, so no. Did the Forest Service reach out to the other groups? Yes, because those groups are a part of the Panhandle Forest Collaborative Group. So if the Forest Service is reaching out, why isn't it reaching out to the alliance? The alliance, I think, has every opportunity to join the— No, that's not my question. You're obviously reaching out to certain groups. You're not reaching out to the alliance. Why did you not reach out to the alliance? We did reach out to the alliance. The Forest Service did reach out to the alliance when it mailed the scoping letter to hundreds of individuals, including the alliance. And so what was the form of the reaching out then to the groups that you did reach out? Was it more than just sending the letter? I'm sorry. What was the question? I'm asking you the difference in treatment, if any, in your reaching out to various groups. And I suspect that you reached out in a different way to the groups with which you had these consultations than your reaching out to the alliance. Can you describe the manner in which this reaching out was accomplished? To the alliance, Your Honor? To both groups. I want the comparison. Well, with the Forest Service Collaborative Group, the Forest Collaborative Group, they work with the forest on many issues, and they seek to reach a consensus with the Forest Service. You're not answering the question yet. Could you please answer the question? I think I'm trying, Your Honor. Okay. Do a better job. I'm asking you what was done to reach out. Well, first of all, the agency published a newspaper notice of the projects that was available for everyone to see. But the agency then put together the scoping letter, and it sent the scoping letter to hundreds of groups and individuals that it knew to be interested in the project, including the alliance. The agency maintained a website for each project, and on that website it had project details, it had maps, it had contact information for who to contact, and it updated the website as the documents became available. The agency also held public meetings. It conducted field trips. Now, you're still not giving me any difference in treatment and reaching out. Was there any difference in reaching out? The Forest Service reached out to the alliance in the same way it reached out to every other member of the public, Your Honor. Okay. And I guess I'll hear from the other side if that's wrong. Okay. But your statement is you treated the alliance identically to other groups with respect to reaching out. Correct. Okay. If that's wrong, I guess I'll hear it. Or if they disagree, I guess I'll hear about that. Well, other than, I guess, with respect to the, I hope, the Forest Panhandle Group. But with that exception. You see, that was my question. You say other than. Okay, so what did you do with the Panhandle Group that you didn't do with the alliance? We met with, the Forest Service met with the Panhandle Group very early on to discuss the project. And as a result. I'm pulling teeth here. When you met with them, how did that meeting come about? Did you call them? Did you contact them asking if they wanted to meet? I don't know the answer to that question, Your Honor. Oh, you know, this is a long time for you to tell me that. Okay. Okay. Well, the scoping letter, like I said, is one of the many things that the agency, one of the many mechanisms the agency used to solicit public comment. Newspaper notices, website, public meetings, field trips. And the agency made clear that Forest Service staff was available to answer questions outside of the public comment period and outside of the FOIA process. Now, my sense of the dates is that the scoping letters went out about six months before the EA is prepared. Is that about right? That sounds about right, Your Honor, yes. So my question, why is it so urgent that you have to rely on the scoping letter, get the decision out, and you can't either wait the six months or accelerate the production of the EA? Well, the six months is not a very long time, and the EA is a pretty complete document, much more complete than the scoping letter. Well, necessarily, the EAs in every case are more complete than a scoping letter. No, I understand that. And so what I'm trying to ask you is why couldn't you do either a much better job on the scoping letter or why couldn't you have just done the EA and moved on from there? Well, the Forest Service determined that because of the timing considerations, it was going to seek public comment very early. And this is consistent with what most Federal agencies do for most EAs. Public EAs are generally not released to the public for comment, and that's the holding of this Court in Bering Strait. It recognizes that agencies do not have to release EAs for public comment, and in fact, in practice, that they rarely are. Okay. Now, the Forest Service's — What's your response, though, that Bering Strait was based upon a situation where there was no regulation and that you now have a regulation that requires a 30-day comment period? Well, the plaintiffs — That seems to be the gist of — Sure. The plaintiffs are — — their appeal. The plaintiffs are misreading that regulation, Your Honor. It doesn't require comment on an EA. It requires comment on an action to be analyzed in an EA. And the regulation gives the agency the discretion to determine when to seek public comment. And evidence of this discretion can be found by looking at the regulation itself, which is found at 36 CFR 218.24. And when you compare the regulation for EISs to the regulation for EAs, it becomes clear. So I'm looking at 218.24a.5. That is the regulation that pertains to EISs. And that regulation states, for a proposed project or activity, that is analyzed in a draft EIS. So it is using the present tense to refer to a draft EIS that is available. The regulation then goes on to make the comment period triggered by the publication of a notice of availability of a draft EIS. So this regulation is clearly contemplating public comment after a draft EIS is available. Now, let's contrast that language with the language at a4, which applies to EAs. This regulation reads, for a proposed project or activity, to be analyzed and documented in an EA. So this regulation is not using present tense, like the EIS regulation. It is using a future tense infinitive, to be analyzed and documented. Which regulation are you reading? 36 CFR 218.24a.4 and a5. So this regulation is clearly contemplating public comment before an EA. It then goes on not to make the public comment period triggered by a draft document, as in the EIS provision, but rather simply a publication of notice in a newspaper. So this regulation is not changing the general rule under NEPA that was stated at Bering Strait, which is that agencies do not have to release draft EAs or the equivalent prior to seeking public comment. That is the holding of every court of appeals to address the issue. And that is why the district court didn't think this issue raised serious questions. Before your time runs entirely, I'd like to ask a question or two related to the criteria for emergency situation determination. And there are three criteria that are available. The Forest Service relies on the first and the third. The first being danger. Summarizing, I'll just attach a single word. And the other one is sort of economic circumstances relating to the viability of the project. So first as to danger, I suspect you're going to say that I heard the right answer as to why you cut different acreages depending on whether the project goes forward or not. If the project doesn't go forward, it's only the public roads that need cutting of the trees. If the project goes forward, you cut trees that are part of the project for the roads that are open. I get that. Well, if the project isn't going to go forward, that means that all of the trees that are a danger to the public, they do come down. So how much does the danger to the public actually cut in here as a criterion? I can understand why you would cut trees 200 yards back, or is it 200 feet, do you remember? 200 feet, I believe, yes. The 200, whatever it is, back. I think it's 200 feet, yeah. If it's a public road that's traveled, continues to travel, why you would have some margin of safety about trees, not only they're already demonstrably dead, but might become dead, but why would you have 200 feet back for logging roads that are going to be used only during the project? That is to say those roads are going to be closed again, so you're not going to have those trees there threatening people on that road once the project's done. I see my time is up if I may answer the question. No, no, please answer. So I don't think that's a complete picture, Your Honor. Okay, complete the picture. I think what the agency was saying is that in 2016 there was a substantial number of trees that were at imminent risk of falling, and it didn't have any money in 2016 to address that problem. So through the money that it received from these projects and from the emergency situation determination, it was able to address that problem immediately in 2016, whereas under the no-action alternative, danger trees would likely be addressed at some point in the future to the extent funding became available, but funding is uncertain. But through this project, it was able to obtain the money to address the trees that were at imminent risk of falling or failing in 2016, and it was also able to obtain the money to address the trees that were at risk of falling over a three- to nine-year period, the longer term. So through this project and through the emergency situation determination, the agency was able to obtain the money to address the problem as a whole. Okay, so let me address the second criterion upon which you rely, that is to say the third criterion, and that is economic circumstances and viability of the project. Viability of the project is, because of the way it's structured here, dependent upon money coming in from the logging. That's always been a bit of an issue. I refer you, of course, to Judge Noonan's separate opinion some years ago saying that we're not getting a disinterested decision-maker because the Forest Service budget is, in part, dependent upon the money it makes from the salvage logging. But this is a more specific version of that. If you structure the project so that money coming in from the project enables the project, I think you're bootstrapping it so you automatically fulfill the criterion. What's your response to that? Well, I think on the face of the regulation, the Forest Service's reasoning complies. And I think the backstop is the APA, Your Honor. All the Forest Service needs to do is provide a non-arbitrary reason for invoking the regulation. And I would submit that the agency provided two here, the public safety criteria and then the commodity value. And what the agency was saying is that if the 90-day administrative objection process was had, and even assuming best-case scenario, that it only took 90 days, the end of the process would come at the end of the operating season, such that it was very risky or highly likely that the project wouldn't be able to begin until the 2017 season, June or July of the summer. And if that were the case, the potential bidders were representing to the Forest Service that they would not likely bid on the contracts, and therefore there would be no money for restoration and for safety. And that's a non-arbitrary reason. What do we have in the record with respect to the potential bidders not likely to bid? The administrator. I mean, I've heard that in other cases, and that turns out to have been demonstrably untrue in the other cases. So I'm skeptical of that statement. So what's in there in the record that tells me that it's true here? The emergency situation determination requests, both of them state that potential bidders had been representing that they would not bid on the projects. And let me explain why. I mean, first, the record is clear that if the project was delayed until the summer of 2017, the appraisal value would be less than the costs. But it also has to be understood that salvage sales are risky for timber contractors because delay causes the value of the trees to diminish. So there's some opportunity cost because they would much rather bid on a live tree sale because with live tree sales, delay means the trees go bigger and larger and they increase in value. So I think that helps explain why bidders were telling the Forest Service that unless they could start in 2016, they weren't interested. Okay. And one last thing I'd like to say. I don't sound like it, but in fact, I'm very sympathetic with the Forest Service because we all know that when these fires go through, if you're going to do salvage logging that's going to produce any significant economic benefit, you've got to move fairly quickly. I understand that, and I'm sympathetic with that. What bothers me is that it seems to me that the Forest Service could have complied more fully with the underlying goals of the environmental statutes and nonetheless done this in a timely fashion. I mean, I'm not saying that I'm ignoring the realities of the situation, but I am suggesting that the Forest Service is short-cutting the administrative procedure in a way that it did not need to do. Do you want me to respond, Your Honor? You may, if you like. Sure. I don't think the Forest Service is short-cutting the NEPA process by any means here. I think the NEPA process here was full, and I think the Forest Service made every effort to, in fact, have a heightened public participation. What the Forest Service did here is what most federal agencies do. And, in fact, the Forest Service did more than what most federal agencies do on most EAs. Okay. Thank you. Now you've saved some time, and we took the government over. I just have a few quick points to address. First, regarding your question about whether the groups were treated differently, I would point the Court to ER 268. This is regarding the tower project where the Forest Service says, quote, initial public involvement efforts were used to develop the proposed action. These included meetings and phone calls with the local collaborative group, tribal timber industry representatives, and county commissioners in November and December 2015. So that was before the scoping letter, and you'll notice that the alliance was not included in those original meetings and phone calls. Those were meetings and phone calls with individuals and groups they knew would support the logging. So there is certainly a difference in treatment. Second, regarding your question, Judge Fletcher, why not just accelerate the EA production? That absolutely could have occurred instead of spending from the fires that stopped burning in October waiting until June. So we're not even talking about six months. We're talking about more like an eight-month period when they could have. But the scoping letter comes out in January. That's correct. So, I mean, again, I'm trying to give the Forest Service its due. It moves quickly. So the fires are in October. The scoping letter comes out in January. Yes. And then the EAs come out in June. Yes. And so why not just have a five-month period of preparing the EA instead of a six-month period, and then that would have given a 30-day public comment period, which would have addressed the concerns here. So absolutely that could have occurred, and they still could have started logging on the same timeline. Well, I think the Forest Service response to that, though, is, but if we do that, then if there are legitimate concerns with the EA or the scoping letter, we then have to add another 60 days, 90 days to revise it. What they're saying here is that we did the scoping letter. We listened to the concerns that were raised and addressed those in the EA. So how do you respond to that? Well, because the environmental analysis has to be provided to public comment before a decision, and their environmental analysis was after the decision. And if I could just address one more issue, I'd like to address my opposing counsel's citations to the regulation. What he cited, he cited 36 CFR 218.24, and he pointed to the fact that if you look in Section A, excuse me, this is 218.24B, content of a legal notice, and then he compared Section 4 to Section 5. Four deals with an EA, five deals with EIS, and he said for the EA they say to be analyzed. For the EIS they say that is analyzed. Well, I would like to point the Court to the actual public comment regulation. This is just the legal notice regulation. The actual public comment regulation is actually 218.25A, opportunity to comment, Part 1, time period for submission of comments. And then if you look at the little I and too little I, the first little I is about environmental assessment. It says to be documented. The second too little I is about an EIS. It also says to be documented. So when we look at the language in the actual public comment regulation, there is no difference at all. And unless there's any further questions, that's all I have for today. Okay. Thank both sides for their arguments. Alliance for the Wild Wokies v. Farnsworth now submitted for decision. Thank both sides. And that concludes the calendar for this morning. We're now adjourned.
judges: Fernandez, W. Fletcher, Melloy